United States District Court
District of Massachusetts

_____
                                  )
HOUSE OF CLEAN, INC.,             )
         Plaintiff,               )
                                  )
         v.                       )      Civil Action No.
                                  )      07-10839-NMG
ST. PAUL FIRE AND MARINE          )
INSURANCE CO., INC.,              )
         Defendant.               )
_____ )

MEMORANDUM & ORDER

GORTON, J.

This breach of contract action arises out of the refusal of several insurance companies to provide coverage under liability policies held by a dry cleaning business, House of Clean, Inc. ("HOC").  HOC's insurance claims were made after the release of certain hazardous material on real property in Andover, Massachusetts.  Before the Court are the parties' motions for summary judgment and St. Paul's motions to strike.

I.  **Factual Background**

Plaintiff HOC was founded by Nicholas Aznoian in 1967.  From 1967 until 2007, HOC operated a dry cleaning business on property at 77 Main Street, Andover, Massachusetts ("the Site").  During that time, HOC used the compound perchloroethylene ("PCE") as the primary cleaning agent in its dry cleaning business.  For the duration of its business operations and, according to HOC, especially from the years 1970 to 1985, PCE was released into the

-1-

soil around the property.

The release of PCE was apparently the product of a two-step process. First, PCE was prevalent in the basement. Used PCE filters and waste PCE, in powder form, were stored in cardboard boxes in the basement near a loading ramp each week awaiting trash collection. Second, when PCE was delivered to a 125-gallon storage tank originally kept in the basement, some PCE apparently leaked out of the deliverer's hose onto the basement floor and delivery ramp. Additional spills occurred when waste PCE was transferred from the first floor to 5-gallon storage buckets in the basement because those buckets would sometimes overflow.

Consequently, HOC alleges, some PCE made its way into the ground during rare, heavy rain storms. A drain located at the base of a loading ramp adjacent to the basement would apparently back up and cause flooding. The PCE in cardboard boxes and on the basement floor would then contaminate the flood waters and flow back into the drain as the water level receded.

In 2005, in conjunction with an inspection by a potential lessee of the property, PCE and trichloroethylene ("TCE") were detected in the soil and groundwater. PCE was also detected in the air of surrounding residential apartments. As a result, on April 4, 2006, pursuant to Mass. Gen. Laws ch. 21E, the Massachusetts Department of Environmental Protection ("DEP") issued a notice of responsibility ("NOR") to HOC stating that

there had been a release of hazardous material and ordering the submission of a response plan.

On October 2, 2006, HOC provided notice of the NOR to two insurers, co-defendants St. Paul Fire and Marine Insurance Company, Inc. ("St. Paul") and Wausau Underwriters Insurance Company ("Wausau"). On August 13, 2008, individuals with interests in the properties around the dry cleaning business brought suit against HOC for damages arising out of the contamination, Callanen, et al. v. Aznoian, et al., Civ. A. No. 08-1640 (Mass. Super. Ct.) ("the Third-Party Action"). In general, HOC seeks to have its insurers defend it against and indemnify it for any liability incurred as a result of the NOR and the Third-Party Action.

On September 18, 2009, HOC and the Third-Party Plaintiffs entered into an interim settlement agreement in which HOC agreed to continue to assume responsibility for and undertake all reasonable and necessary response actions required to achieve Class A2 Partial Response Action Outcomes for the Third-Party Plaintiffs' properties, as well as for HOC to establish a "reasonable financial assurance" of approximately $680,000 for the completion of the same. To date, HOC claims it has incurred over $1.6 million in indemnity expenses.

## II. **Procedural History**

After sending to St. Paul several demand letters and failing to receive a written response, HOC filed its complaint on May 2, 2007 against St. Paul.  St. Paul responded by letter dated May 11, 2007, that it would conditionally participate in the defense of HOC under a complete reservation of rights.  In an amended complaint, HOC added allegations that St. Paul violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A").

On July 23, 2007, however, HOC and St. Paul entered into an agreement whereby HOC would release St. Paul from certain liability in exchange for a payment.  In November, 2008, after HOC successfully reopened the case due to St. Paul's refusal to pay its defense costs, the parties added to the July, 2007 agreement new procedures for the payment of defense costs and, with leave of Court, the litigation was stayed once again.  Also that fall, HOC amended its complaint a second time to add Wausau as party defendant.

On April 30, 2009, the Court granted HOC's motion to amend its complaint a third time to add additional defendants, Globe Indemnity Company and Royal-Globe Insurance Company ("Royal"). In a Memorandum & Order on April 2, 2010, the Court allowed plaintiff's motion for partial summary judgment on its breach of contract claim against Arrowood Indemnity Company ("Arrowood"), a

successor to Royal, but allowed Arrowood's motion for partial summary judgment on HOC's Chapter 93A claim.  <u>House of Clean, Inc.</u> v. <u>St. Paul Fire & Marine Ins. Co., Inc.</u>, 705 F. Supp. 2d 102 (D. Mass. 2010).  Thereafter, Arrowood was voluntarily dismissed along with all other defendants except St. Paul.

Currently, the only remaining counts are for a declaratory judgment and breach of contract against St. Paul.  In April, 2011, the Court heard oral argument on plaintiff's motion to amend its complaint a fourth time to re-allege a Chapter 93A claim against St. Paul.  The Court denied the motion.  Now before the Court are the parties' motions for summary judgment and St. Paul's motions to strike two of HOC's affidavits and an expert report.

## III. <u>Cross Motions for Summary Judgment</u>

### A.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

### B. The Parties' Positions

HOC moves for a declaration that St. Paul is obligated to defend HOC in litigation brought by the DEP and other third parties and has breached that duty by refusing to pay its reasonable defense-related costs. St. Paul moves for a declaration that it has no duty to defend or indemnify HOC

because 1) HOC has not provided evidence of property damage taking place during the alleged policy period (January 1, 1970 through January 1, 1981) and 2) coverage under the January 1, 1973 through January 1, 1981 insurance policies is barred by the pollution exclusions in those policies.[1]  The pollution exclusions provide that the insurance polices do not provide coverage for:

> property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourses or body of water; <u>but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental</u>.

(emphasis added).[2]  The parties dispute whether the release of PCE in this case was "sudden and accidental" and, therefore, covered by the insurance policies.

### C.  Duty to Defend

#### 1.  Duty to Defend Standard

In general, if the allegations against an insured are "reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms," the insurer must proffer a defense.  <u>E.g.</u>, <u>Essex Ins. Co.</u> v. <u>BloomSouth Flooring</u>

---

[1]  The January 1, 1970 through January 1, 1973 policies do not contain pollution exclusions.

[2]  One policy adds: "and is neither expected nor intended from the standpoint of the insured."

Corp., 562 F.3d 399, 403 (1st Cir. 2009) (citations omitted).
Further, if such allegations (i.e., those reasonably susceptible
to an interpretation that they state a claim) exist on the face
of the underlying claims, then to escape the duty to defend, an
insurer must demonstrate "with conclusive effect" that the third-
party cannot establish a claim within the policy.  In re Acushnet
River & New Bedford Harbor, 725 F. Supp. 1264, 1266 (D. Mass.
1989).

### 2.   St. Paul's Duty to Defend

With respect to St. Paul's duty to defend, the Court
concludes, for the reasons set forth in its April, 2010 M&O, that
the NOR and the related third-party civil action established St.
Paul's duty to defend.  In that M&O, the Court found that
Arrowood had a duty to defend the third-party claims:

> Although HOC may not ultimately be indemnified because of
> a possible finding that the PCE release(s) were not
> "sudden and accidental", the standard for imposing a duty
> to defend is broad and the claims against HOC are at
> least reasonably susceptible to an interpretation that
> they are covered.

House of Clean, 705 F. Supp. 2d at 109.  Thus, the Court will
allow plaintiff's motion for summary judgment on Count I
(declaratory judgment) with respect to St. Paul's duty to defend.

### 3.   Breach of Contract

HOC contends that St. Paul's failure properly to acknowledge
its duty to defend and refusal to pay and/or reimburse
substantial defense costs constitutes a breach of its insurance

policies with HOC.

### a.  St. Paul's Conduct Prior to July 1, 2007

HOC first argues that its multiple notice of claim and demand letters provided notice to St. Paul and established St. Paul's contractual obligation to provide a defense, independent from any obligation to indemnify.  Indeed, after several affirmations that a coverage determination would be forthcoming, St. Paul/Travelers failed to take a position on HOC's claims for defense and coverage.  It was not until May 11, 2007, one week after the complaint was filed in this case, that St. Paul agreed to participate in the defense of HOC under a complete reservation of rights.

That conduct clearly constitutes a breach of the duty to defend.  See Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 623 F. Supp. 2d 98, 102 (D. Mass. 2009) (holding that the insurer's refusal to pay defense costs until after it was sued by the insured constituted a breach of its duty to defend).  The conundrum, however, is whether the parties' July 23, 2007 agreement released St. Paul from liability for that breach and prevents the burden shifting that a breach would entail.

Plaintiff asserts that the agreement specifically did not release St. Paul with respect to Counts I (declaratory judgment) and II (breach of contract).  St. Paul responds that the July 23, 2007 release of liability applied to all causes of action, not

just the Chapter 93A claim.  The release states that, in return

for St. Paul's payment, HOC released St. Paul

> from any liability arising from or relating to this
> matter for . . . (2) defense, claim presentment or any
> other costs incurred by Rubin and Rudman prior to July 1,
> 2007 . . . and (3) claims under Chapter 93A of the
> Massachusetts General Laws, or any other bad faith claim,
> with respect to any conduct by St. Paul that occurred
> prior to the date of this letter agreement. . . .
> Plaintiffs do not release, and in fact expressly
> preserve, any and all claims or causes of action arising
> from conduct that takes place after the date of this
> letter agreement.[3]

The Court finds that the most reasonable interpretation is

that 1) HOC released St. Paul from all liability arising from its

pre-July 1, 2007 failure to acknowledge its duty to defend and

2) HOC completely dismissed Count III, the Chapter 93A claim, but

retained Counts I and II with respect to conduct occurring after

July 1, 2007 only.  There are two reasons why this interpretation

makes the most sense:

First, if HOC meant to dismiss only its Chapter 93A claim,

then the clause which releases St. Paul from any liability

arising from or relating to defense costs before July 1, 2007

would be superfluous.  "An interpretation which gives a

reasonable meaning to all of the provisions of a contract is to

be preferred to one which leaves a part useless or inexplicable."

<u>Metro. Prop. & Cas. Ins. Co.</u> v. <u>Fitchburg Mut. Ins. Co.</u>, 793 N.E.

---

[3] Claim presentment costs are attorney's fees paid in a
litigation against the insurer.

2d 1252, 1256 (Mass. App. Ct. 2003) (quoting Sherman v. Emp'rs

Liab. Assurance Corp., 178 N.E. 2d 864, 866-67 (Mass. 1961)).

Thus, in order to give meaning to every part of the agreement,

the Court must interpret it in the manner that St. Paul suggests.

Second, as part of the agreement, the parties stayed the

case.  That indicates that the agreement was essentially a

settlement conditioned upon St. Paul continuing to provide a

defense.  In May, 2008, HOC moved to reopen the case because it

was not satisfied with the payments it was receiving from St.

Paul.  In response, in November, 2008, the parties amended the

agreement and then moved once again to stay the case.  Those

actions indicate that HOC was not pursuing its claims with

respect to pre-July 1, 2007 conduct but, instead, sought to keep

the case open to ensure that St. Paul complied with its duty to

defend throughout the pendency of the Third-Party Action.

Thus, the Court need only determine whether St. Paul

breached its duty to defend after July 1, 2007.

### b.   St. Paul's Conduct After July 1, 2007

HOC submits that St. Paul breached its duty to defend after

July 1, 2007 by failing to reimburse over $900,000 of disputed

defense costs or explain its refusal.  This Court has held that

an insurer could be justified in refusing to pay

> 1) pre-tender costs (i.e., defense costs incurred by the
> plaintiffs before they notified insurers of the claims
> against them), 2) costs related to remediation or 3)
> costs that could be construed as unreasonable.

-11-

Jenkins Starr, LLC v. Cont'l Ins. Co., Inc., 601 F. Supp. 2d 344, 346 (D. Mass. 2009). Even where the insurer has breached its duty to defend, the insured must prove the existence and amount of the expenses and that those expenses were reasonable and necessary defense costs. See Liberty Mut. Ins. Co. v. Cont'l Cas. Co., 771 F.2d 579, 582 (1st Cir. 1985). The reasonableness of claimed defense costs is a question of fact. See Nationwide Mut. Ins. Co. v. Lafarge Corp., 121 F.3d 699, at *2 (Table) (4th Cir. 1997); Jenkins Starr, LLC, 601 F. Supp. 2d at 347.

St. Paul asserts that, as of July 23, 2007, it has (with Nationwide) reimbursed HOC for 100% of its reasonable and necessary defense costs. So far, St. Paul has reimbursed approximately $1.25 million to HOC. St. Paul asserts that it has refused to pay only where it was unable to determine 1) whether the invoice was for defense or indemnity-related work, 2) what work was being done or 3) the reasonableness of the tasks being undertaken. St. Paul has treated investigation and site assessment costs as defense expenses but remedial analysis and execution as indemnity.

HOC provides explanations for only two charges. First, it claims $512,563 for lost opportunity costs with respect to monies that it was required to escrow to satisfy the Third-Party Plaintiffs. HOC argues that those monies are defense costs because HOC and the Aznoian Estate, which loaned the funds, will

suffer financial losses as a result of St. Paul's failure to recognize its duty to indemnify.  Second, HOC claims as a defense cost the $12,000 it paid to hook up the St. Augustine School to town water so that it did not have to rely on its PCE-contaminated well water.  HOC argues that that was a defense cost because it negated litigation with the school.

The exhibits submitted by the parties appear to be only a sampling of their correspondence related to the payment of defense costs after July 23, 2007.  In order to assess the reasonableness of those claimed costs fully, the Court needs documentation and an explanation of all of the claimed costs.  Even if that is provided, the question of whether such costs were reasonable and necessary is one of fact for the jury.  For that reason, the parties' motions for summary judgment with respect to St. Paul's breach of its duty to defend will be denied.

### 4.  Claim Presentment Fees and Costs

HOC maintains that it is entitled to recover its claim presentment fees and costs.  The so-called "American Rule" provides that, generally, the litigant must bear his own expenses.  Waldman v. Am. Honda Motor Co., 597 N.E. 2d 404, 406 (Mass. 1992).  In Preferred Mutual Insurance Co. v. Gamache, however, the Massachusetts Supreme Judicial Court ("the SJC") articulated an exception to that rule for cases in which an insured successfully establishes that the insurer breached its

duty to defend.  686 N.E. 2d 989, 993 (Mass. 1997).

St. Paul opposes the motion, arguing that the rule set forth in Gamache does not apply where the insurer has defended under a reservation of rights and has not forced the policyholder to litigate the duty to defend.  See Wilkinson v. Citation Ins. Co., 856 N.E.2d 829, 835 (Mass. 2006).

The Court finds that, due to the July, 2007 release, HOC is entitled to post-July 1, 2007 claim presentment costs only if the jury finds that St. Paul breached its duty to defend by refusing to pay reasonable and necessary defense costs after that date.

### D.  Duty to Indemnify

#### 1.  Duty to Indemnify Standard

The duty to indemnify is narrower than the duty to defend. Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 66 (1st Cir. 2000).  The duty to indemnify "arises only after the insured's liability has been established".  Wilkinson, 856 N.E. 2d at 836.  The duty to indemnify, unlike the duty to defend, is determined by the facts as they unfold at trial or in a settlement agreement, rather than simply the pleadings. Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1099 (1st Cir. 1989).  The dispositive issue in an indemnification analysis is whether the third party plaintiff's theory of litigation, and the eventual settlement or result, "encompassed allegedly wrongful conduct by the [insured] in his

insured capacity, as defined in the [insurance] policy."
D'Amelio v. Fed. Ins. Co., Civ. A. No. 02-12174, 2004 WL 937328,
at *7 (D. Mass. Apr. 28, 2004).

Because HOC does not seek summary judgment on this issue and
opposes St. Paul's motion, the Court views the record in the
light most favorable to HOC.

### 2. The 1970-1973 Policies: Property Damage

St. Paul maintains that it has no duty to defend or
indemnify HOC because HOC has not proffered any evidence that
third-party "property damage" took place during the policy
period, especially January 1, 1970 through January 1, 1973.

The parties' witnesses disagree as to when the damage
occurred. Mr. Fichera explained that the waste was stored in
cardboard boxes in the basement from at least 1970 until 1985 and
Ian Phillips, HOC's expert, is of the opinion that the releases
occurred between 1969 and 1985. Neither man identified a
specific basement flood in one of those years, however. Instead,
they estimate that there was an average of at least three heavy
rain events per year during that period. In contrast, St. Paul's
expert, Duff Collins, asserts that Mr. Phillips' calculations are
flawed and the discharge may have commenced before 1970 and
continued well after 1985 until 2006 when HOC ceased to operate
its dry cleaning business. Given those conflicting opinions, the
issue of when the PCE releases occurred presents a genuine issue

of material fact which precludes summary judgment with respect to the 1970-1973 policies.

### 3.    The 1973-1981 Policies: Pollution Exclusion

St. Paul argues that it does not have a duty to defend or indemnify because 1) all of the policies issued after January 1, 1973 contain pollution exclusions and 2) the PCE releases at issue here do not fall under the "sudden and accidental" exception.  HOC maintains that genuine issues of material fact exist relating to whether the releases constitute "sudden and accidental" polluting events.

### a.    Burden of Proof

The insurer bears the burden of showing that a pollution exclusion applies.  See Highlands Ins. Co. v. Aerovox Inc.,676 N.E. 2d 801, 805 (Mass. 1997).  If the insurer makes such a showing, the burden shifts back to the insured to show that the alleged contamination was caused by a "sudden and accidental" release.  Id.  Here, the parties do not dispute that the PCE releases constitute pollution subject to the exclusion in the insurance policies.  Thus, HOC bears the burden of showing that the releases were "sudden and accidental".

HOC argues, however, that because St. Paul breached its duty to pay its defense costs, the burden shifts to St. Paul to prove that the "sudden and accidental" exception does not apply.  See Peabody Essex Museum, Inc., 623 F. Supp. 2d at 110 ("[The

insurer], having breached its duty to defend, bears the entire burden of proving that the release of oil was not sudden or accidental."); _Polaroid Corp._ v. _Travelers Indem. Co._, 610 N.E.2d 912, 922 n.22 (Mass. 1993).

Again, this issue depends upon whether the jury finds that St. Paul breached its duty to defend by refusing to pay reasonable and necessary defense costs. Nevertheless, the legal question of whether the floodings of the basement were "sudden and accidental" does not depend upon where the burden of proof lies.

### b. Sudden and Accidental

The question of whether a pollution event is "sudden and accidental" is a question of law. _Lumbermens Mut. Cas. Co._ v. _Belleville Indus., Inc._, 938 F.2d 1423, 1427 (1st Cir. 1991) ("_Belleville II_"). Under Massachusetts law, "sudden" carries a temporal element requiring an abrupt, non-gradual release. _Lumbermens Mut. Cas. Co._ v. _Belleville Indus., Inc._, 555 N.E.2d 568, 572 (Mass. 1990) ("_Belleville I_"). The dispositive inquiry is whether the triggering event is "so beyond the pale of reasonable expectability as to be considered 'accidental.'" _Aerovox_, 676 N.E. 2d at 806 n. 10. In making that determination, both the SJC and the First Circuit have focused on whether the event that caused the pollutant discharge is common or uncommon. _Millipore Corp._ v. _Travelers Indem. Co._, 115 F.3d 21, 33 (1st

Cir. 1997) (citing <u>Nashua Corp.</u> v. <u>First State Ins. Co.</u>, 648

N.E.2d 1272, 1276 (Mass. 1995) and <u>Aerovox</u>, 676 N.E.2d at 806

n.10).

HOC argues that the PCE releases were sudden and accidental

because they were caused by infrequent basement flooding.[4]  St.

Paul counters that the releases were not sudden and accidental

because, but for HOC's routine practice of storing PCE in

cardboard boxes in the basement, the basement flooding would not

have released PCE into the groundwater.  St. Paul also contends

that HOC's assertions are too conclusory and speculative to

withstand summary judgment because HOC has not pointed to any

specific basement flooding that caused the pollution.  <u>See</u> <u>Am.</u>

<u>States Ins. Co.</u> v. <u>Kirsch</u>, No. 94-2308, 1995 Mass. Super. LEXIS

47, at *19 (Mass. Sup. Ct. Sept. 1995) (finding that the insured

dry cleaner failed to establish that its PCE discharges were

"sudden and accidental" because it produced no evidence of abrupt

discharges).

It is clear from the case law that an unexpected or one-time

event, such as a fire or a flood, on its own constitutes a

"sudden and accidental" occurrence.  <u>See, e.g.</u>, <u>Nashua Corp.</u>, 648

_____

[4] The parties also dispute the extent to which the basement
flooding contributed to the pollution.  The only releases that
HOC claims fall within the "sudden and accidental" exception,
however, are the releases due to basement flooding and the
Court's analysis of coverage under the policies will, therefore,
be limited to those events.

N.E.2d at 1276 (burst tank seal, fire and explosion were "sudden and accidental" occurrences).

It is also well-settled that pollution discharges caused by an insured's routine and regular business practices are not considered "sudden and accidental". See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1201 (1st Cir. 1994) (finding that the insured's waste disposal practices in the regular course of business were intentional and the pollution was expected even though it was the waste disposal company, not the insured, who ultimately deposited the chemicals in a landfill); Belleville II, 938 F.2d at 1430. A discharge continuing over an extended period of time is not likely to be considered "sudden". Liberty Mut. Ins. Co. v. SCA Servs., Inc., 588 N.E.2d 1346, 1350-51 (Mass. 1992); see also Landauer, Inc. v. Liberty Mut. Ins. Co., 628 N.E.2d 1300, 1301-02 (Mass. App. Ct. 1994) (holding that the regular discharge of pollutants into a landfill over four years did not constitute a "sudden and accidental" occurrence).

Because this case involves both regular business practices and heavy rainstorms, it presents a challenging inquiry. The basement floodings were sudden and accidental events but the storage of PCE powder in the cardboard boxes in HOC's basement was an intentional and regular business practice. After careful review of the case law, the Court concludes that the first time HOC's basement flooded, the release of PCE qualified as "sudden

and accidental", but thereafter HOC's continued practice of storing PCE in the same manner for 16 years was intentional and the resulting pollution was not accidental.

HOC alleges that the basement flooding "occurred infrequently, potentially only a few times per year over several decades." In his Rebuttal Expert Report, however, Ian Phillips estimated that the basement was flooded an average of three to five times per year between 1970 and 1985. HOC does not question that estimate. Mr. Fichera (who worked at HOC from 1970 to 1984 or 1985) testified at his deposition that HOC's basement storage area flooded "[e]very time it used to rain hard". Although he stated that the storms that caused the flooding were unpredictable and atypical, he testified that the basement storage area flooded between five and ten times per year.

Mr. Fichera also attested that he knew that the boxes leaked pollutants whenever the basement flooded but that

> I didn't think anything of it. I knew it was there. I knew they were getting wet, but I didn't think that it could cause damage to anybody.

He recognized that the release of the residue into the flood water was "not a good thing to happen" and tried wrapping up the cartridges when there was flooding. It is apparent, therefore, that he knew that the storage of PCE in cardboard boxes in the flood-prone basement would result in pollution during heavy rain storms, yet continued to store PCE in that manner for 16 years.

Finally, Mr. Fichera testified that he knew, from about 1972 on, that PCE was a potential carcinogen and was "toxic". He stated that he knew to be careful and clean up when PCE was spilled. Mr. Fichera emphasized that he did not know that the releases would cause damage. The Court's focus, however, is on the discharge, not the resulting damage. See Warwick Dyeing Corp., 26 F.3d at 1203 ("what must be sudden and accidental is the discharge and not the resulting damages"); Belleville I, 555 N.E.2d at 571 (the "sudden and accidental" exception to the pollution exclusion "focuses on the circumstances of the release" not on the resulting property damage).

This case is analogous to several cases in which courts have held that the pollutant releases were not "sudden and accidental" because they should have been anticipated from the insured's routine business practices. For example, in Belleville II, the Court held that discharges resulting from two separate pollution events, a heavy rainstorm and a fire, were not "sudden and accidental" because they were caused by a continuous pattern of dispersal of waste at the site. 938 F.2d at 1424. Similarly, in SCA Services, Inc., the court held that a "pattern of conduct" in which a policyholder disposed of barrels of hazardous waste at a landfill over the course of several months was not a "sudden and accidental" event, even though the actual release of pollutants was caused by the abrupt crushing of each barrel at the landfill,

because the pollution resulted from "continuous waste disposal practices occurring over a protracted period of time as a concomitant part of a regular business activity." 588 N.E.2d at 1350-51; see also Emp'rs Ins. of Wausau v. George, 673 N.E.2d 572 (Mass. App. Ct. 1996) (holding that discharges were not accidental because the fire and spill were caused by conditions created by the insured's intentional practice of pumping toxins into a catch basin and disposing of waste in a landfill); United Techs. Corp. v. Liberty Mut. Ins. Co., No. 87-7172, 1993 Mass. Super. LEXIS 281, at *117-19 (Mass. Super. Ct. Aug. 3, 1993) (holding that pollution discharges were not "sudden and accidental" because they were due to leaks and spills during routine manufacturing processes and the handling of chemicals).

HOC argues that Belleville II and SCA Services, Inc. are distinguishable because, in those cases, the insured entities deliberately disposed of pollutants, whereas HOC's pollution was unintentional. Indeed, this Court acknowledged in its April, 2010 M&O that Belleville II is distinguishable because in that case

> the insured knew about regularly-occurring pollution,
> tried to neutralize it and then deliberately released the
> resulting pollutants into the municipal sewer system[.]

House of Clean, Inc., 705 F. Supp. 2d at 109 (citations omitted). Despite the factual differences, however, the Court finds Belleville II, and the other cases cited above, instructive. As

in those cases, the pollution here resulted from a regular business practice that HOC knew was causing waste PCE powder to dissolve and escape out of the basement drain every time the basement flooded.

Plaintiff argues that <u>UniFirst Corp.</u> v. <u>Liberty Mutual Insurance Co.</u> is persuasive but the discharges that the plaintiff alleged were "sudden and accidental" in that case are distinguishable from what occurred here. No. 08-4300, 2011 Mass. Super. LEXIS 16, at *6-7 (Mass. Super. Ct. Feb. 15, 2011). In <u>UniFirst Corp.</u>, the releases allegedly occurred when a pipe on a delivery truck broke and several drums of PCE were inadvertently punctured by a forklift. <u>Id.</u> at *1. In contrast to the situation at hand, those incidents were not caused by the insured's regular business practices. Instead, they were entirely accidental and abrupt events. <u>See</u> <u>id.</u>

In sum, the Court finds that the PCE discharges caused by the flooding of HOC's basement were not "sudden and accidental" and, as a result, the pollution exclusions in the 1973-1981 policies apply here. Defendant's motion for summary judgment will, therefore, be allowed with respect to its duty to indemnify HOC for any losses it incurs as a result of pollution that occurred within those years.

**IV. <u>Motion to Strike Hearsay Affidavits</u>**

On April 27, 2011, St. Paul moved to strike the affidavits of Nicholas Aznoian, HOC's owner, and Rosario Fichera, HOC's former manager, because they constitute inadmissible hearsay. St. Paul argues that the affidavits are inadmissible hearsay and should not be considered because the men are deceased and, therefore, cannot be cross-examined at trial. <u>See</u> <u>Rodriguez-Laboy</u> v. <u>R&R Eng'g Prods.</u>, Civ. A. No. 03-1367, 2006 U.S. Dist. LEXIS 19561, at *2-3 (D.P.R. Mar. 30, 2006) (striking affidavit of deceased affiant as hearsay for the purposes of summary judgment); <u>Crittenden</u> v. <u>Children's Hosp.</u>, No. 96-CV-549S, 2004 U.S. Dist. LEXIS 12944, at *4-6 (W.D.N.Y. June 30, 2004) (stating that none of the hearsay exceptions apply to the affidavit of a deceased affiant but that his deposition testimony could be used instead).

Fed. R. Civ. P. 56(c)(4) provides that

An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Both parties agree that the affidavits constitute hearsay. <u>See</u> Fed. R. Evid. 801. Although the Court relied on the affidavits in its April, 2010 M&O because they "add substance and meaning to the complainants' skeletal allegations", the Court made no ruling on their admissibility. <u>House of Clean, Inc.</u>, 705 F. Supp. 2d at

109.  HOC maintains that the affidavits are admissible pursuant to Federal Rules of Evidence 803(6), 804(b)(3) and 807.

Fed. R. Evid. 804(b)(3) provides an exception to the hearsay exclusion for a statement against interest, which it defines as a statement that

> a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability[.]

HOC argues that, at the time the affidavits were made (November 10, 2006), they could have been used to provide grounds and/or evidence of liability of Mr. Aznoian and Mr. Fichera, as well as HOC, to the DEP and other third-parties.

The Court finds that the affidavits do not meet the standard in Fed. R. Evid. 804(b)(3).  The admissions by Mr. Fichera and Mr. Aznoian that HOC placed PCE in cardboard boxes in HOC's basement, which occasionally flooded, could be against their interest in terms of the DEP and third-party actions. Nevertheless, both men emphasized that the releases of PCE were "sudden and accidental", "unintended and unexpected" and "occurred sporadically".  They clearly had in mind the pollution exclusion in the insurance policies.  Moreover, because the NOR had already been issued and the nature and source of the contamination was largely known, Mr. Fichera and Mr. Aznoian

could hardly deny HOC's responsibility.  Instead, the affidavits

appear to be directed at establishing that the pollution was

"sudden and accidental" which was in HOC's interest.  Thus, the

affidavits do not appear to be "contrary to the declarant's

proprietary or pecuniary interest" and the Court finds that they

do not fall within the ambit of Fed. R. Evid. 804(b)(3).

Likewise, the Court concludes that the affidavits are not

records of regularly conducted activity, as defined in Fed. R.

Evid. 803(6).  A record falls under that exception if it was

> made at or near the time by, or from information
> transmitted by, a person with knowledge, if kept in the
> course of a regularly conducted business activity, and if
> it was the regular practice of that business activity to
> make . . . unless the source of information or the method
> or circumstances of preparation indicate lack of
> trustworthiness.

HOC asserts that the affidavits were made in order to

provide notice to HOC's insurers and to be used in defense of HOC

against the DEP and in any third-party litigation.  That

assertion confirms that the affidavits were made in anticipation

of litigation which, in turn, renders them less trustworthy than

if they had been made in the "regular course" of business.  See

Palmer v. Hoffman, 318 U.S. 109, 113-14 (1943).  Furthermore, the

affidavits were made many years after the events they seek to

memorialize and, therefore, fail to meet the requirement that the

records be "made at or near the time".

Finally, HOC's argument that the affidavits fall under the

residual exception to the hearsay rule is unavailing.  Fed. R.
Evid. 807 provides that a statement that has "circumstantial
guarantees of trustworthiness" is not excluded by the hearsay
rule

> if the court determines that (A) the statement is offered
> as evidence of a material fact; (B) the statement is more
> probative on the point for which it is offered than any
> other evidence which the proponent can procure through
> reasonable efforts; and (C) the general purposes of these
> rules and the interests of justice will best be served by
> admission of the statement into evidence.

The residual exception is "to be used sparingly, in exceptional
circumstances."  Kosilek v. Maloney, 221 F. Supp. 2d 156, 172 n.9
(D. Mass. 2002).

With respect to Mr. Fichera's affidavit, most of the
statements are also in his deposition transcript, which may be
admissible.  See Fed. R. Evid. 32(a)(3) and 804(b)(1).  Thus, the
affidavit is not more probative than other evidence.  With
respect to the trustworthiness of the affidavits, when statements
are made for the purposes of litigation, the potential motivation
of the affiant undermines the statements' trustworthiness.  See
Palmer, 318 U.S. at 113-14.  Also pertaining to trustworthiness,
Mr. Fichera testified at his deposition that he thought his
affidavit was 99.9% accurate but that he had no part in drafting
it.  It was presented to him over lunch by Mr. Aznoian and he
reviewed it for five minutes or so.  Accordingly, there are no
circumstantial guarantees of trustworthiness here and the Court

finds, therefore, that the affidavits are not admissible under the residual hearsay exception.

In sum, the Court finds that the affidavits are hearsay not falling within an exception. For that reason, St. Paul's motion to strike will be allowed.

## V.   Motion to Strike Third Expert Report of Ian Phillips

St. Paul moves to strike the Supplemental Report of HOC's expert, Ian Phillips (the contents of which were filed by HOC in the form of an affidavit on May 3, 2011). St. Paul argues that the report should be excluded because it was not served on the defendants until May 12, 2011 and is substantively unreliable. HOC opposes the motion on the grounds that the report was timely served more than 30 days prior to trial, in accordance with Fed. R. Civ. P. 26(e) and 26(a)(3), will not prejudice St. Paul and is reliable. HOC seeks costs and fees incurred in opposing that motion.

St. Paul's motion will be allowed with respect to the summary judgment determination. St. Paul did not have an adequate opportunity to review the report and depose Mr. Phillips with respect to the Supplemental Report before the summary judgment motions were filed. Thus, the Court has not considered Mr. Phillips' Supplemental Report for the purposes of its summary judgment determination. With respect to HOC's use of the report at trial, however, the motion is denied, without prejudice and on

the condition that HOC makes Mr. Phillips available for a short, supplemental deposition at defendant's convenience and plaintiff's expense before Mr. Phillips testifies at the trial.

**ORDER**

In accordance with the foregoing,

1) plaintiff's motion for partial summary judgment (Docket No. 92) is, with respect to St. Paul's duty to defend within Count I, **ALLOWED**, but in all other respects, **DENIED;**

2) defendant's motion for summary judgment (Docket No. 100) is, with respect to the duty to defend for all policy years and the duty to indemnify for the period between January 1, 1970 and January 1, 1973, **DENIED**, and, with respect to the duty to indemnify for the period between January 1, 1973 and January 1, 1981, **ALLOWED;**

3) defendant's motion to strike hearsay affidavits (Docket No. 105) is **ALLOWED;**

4) defendant's motion to strike the supplemental expert report of Ian Phillips (Docket No. 118) is, for the purposes of the Court's ruling on the summary judgment motions, **ALLOWED,** but in all other respects the motion is **DENIED,** without prejudice provided however that plaintiff makes Mr. Phillips available for a short, supplemental deposition at defendant's convenience and plaintiff's expense before Mr. Phillips testifies at the trial.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated May 27, 2011